# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**DENISE LAMAUTE,**

      *Plaintiff,*

**v.**

                                               **Case No. 19-cv-3702 (RCL)**

**SAMANTHA POWER,** Administrator,
U.S. Agency for International Development,

      *Defendant.*

## <u>MEMORANDUM OPINION</u>

Two longtime employees of the United States Agency for International Development ("USAID") applied for a supervisory position in 2017. The plaintiff, Denise Lamaute, an older Black woman, was not selected. Ms. Lamaute claims that USAID discriminated against her on the basis of race, sex, and age in violation of Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, 253–66 (codified as amended in 42 U.S.C. § 2000e *et seq.*) when it chose to fill the position with her competitor, Mark Pickett, a white man. She points to her allegedly longer tenure working in the relevant subject-matter area and USAID's deviation from certain internal diversity safeguards and hiring best practices, among other factors, as circumstantial evidence of discrimination. USAID responds that Mr. Pickett was selected for a legitimate, nondiscriminatory reason—his superior management experience in the relevant subject-matter area—and that Ms. Lamaute has not offered sufficient evidence from which a reasonable jury could draw the inference that USAID's stated reason was merely pretextual.

After engaging in discovery, USAID moved for summary judgment. For the reasons that follow, the Court will **GRANT** USAID's motion, **ENTER JUDGMENT** for USAID, and **DISMISS WITH PREJUDICE** the complaint.

# I.     BACKGROUND

The Court will first discuss the factual background of this case, including: (1) USAID's posting and description of the position; (2) the contents of the applications submitted by Ms. Lamaute and Mr. Pickett; (3) the composition of the selection panel; (4) the criteria the selection panel used in evaluating the candidates; (5) the interviews the selection panel conducted with Ms. Lamaute and Mr. Pickett; (6) the ultimate selection decision made by the panel; and (7) the relevant USAID policies. The Court will then address the case's procedural background.

## A. Factual Background

### 1. Posting and Position Description

On August 14, 2017, USAID opened applications for a position titled "Supervisory General Business Specialist," at ranking GS-15 ("the Position"). Position Posting, Ex. 1 to Def.'s MSJ, ECF No. 68-1, at USAID-99.[1] The Position was only open to internal candidates, that is, individuals who were already USAID employees. *Id.* The Position description noted that the Position was "located in the Bureau for Europe and Eurasia, Technical Support Office (E&E/TSO)" and the individual in the position would "serve[] as the Division Chief of the Economic Growth Division (E&E/TSO/EG)." Position Description, Ex. 6 to Def.'s MSJ, ECF No. 68-6, at USAID-5. The Position description further stated that the individual in the Position would be expected to perform the following functions: "lead in the strategy development, design, implementation, and coordination of USAID-financed enterprise restructuring, debt and equity capital formation, market development, export promotion, and public financial management in the E&E region and nearby financial markets"; "counsel and advise senior USAID and other high-level government officials, and private business leaders at both the policy and technical levels";

---

[1] Leading zeroes in page numbers have been omitted for readability.

"provide advice and leadership to technical teams with expertise related to other investment-related projects"; "be responsible for evaluating and implementing on-going and new programs"; and "interact with business and government leaders to promote economic development in the E&E region[.]" *Id.*

The Position description explained that 40% of the duties and responsibilities would occur in the area of "oversee[ing] economic development programs," 35% would be in the area of "execut[ing] supervisory and managerial duties," and 25% would be in the area of "provid[ing] liaison and advisory services." Position Description at USAID-6–7; Def.'s Statement of Undisputed Material Facts ("Def.'s SUMF"), ECF No. 68-10, ¶ 2; Pl.'s Statement of Disputed Material Facts ("Pl.'s SDMF"), ECF No. 70-2, ¶ 2. Within those general areas, the Position encompassed the following specific responsibilities: (1) "Supervise a group of employees performing work at the GS-7 through GS-14 grade levels; (2) "Lead the design and development of new economic growth programs and projects, including initial reconnaissance of projects"; (3) "Ensure that policies, instructions, and procedures address the needs and problems of agency management and grantee organizations"; (4) "Prepare, or oversee others prepare, project papers, project agreements, project authorizations, Congressional notifications, implementation letters, and similar documents"; (5) "Take part in agency and interagency policy formulation and review liaison activities for USAID programs"; (6) "Serve as an advisor on policy, program, and implementation issues related to economic development in the E&E region"; and (7) "Oversee technical support to economic growth programs in the E&E missions." Position Posting at USAID-101. The Position contained a supervisory status element. Def.'s SUMF ¶ 4; Pl.'s SDMF ¶ 4; Position Posting at USAID-102.

The description listed several qualifications for the Position. Those qualifications required, in relevant part, that the applicant have at least "one year of specialized experience at a level of difficulty and responsibility equivalent to the GS-14 level in the Federal service." Def.'s SUMF ¶ 5; Pl.'s SDMF ¶ 5; Position Posting at USAID-102. Examples of qualifying experience included: "(a) developing strategies involving enterprise restructuring, debt and equity capital formation, market development, export promotion, and public financial management; (b) providing advice to technical teams with expertise related to investment-related projects; (c) evaluating and implementing ongoing and new programs; and (d) working with business and government leaders to encourage trade development, public/private partnerships, and linkages between competitive business clusters and investment clients." Def.'s SUMF ¶ 6; Pl.'s SDMF ¶ 6; Position Posting at USAID-102.

### 2. Applicants

Ultimately, USAID selected two applicants to interview for the Position: Ms. Lamaute and Mr. Pickett. Def.'s SUMF ¶ 7; Pl.'s SDMF ¶ 7; Selection Certificate, Ex. 7 to Def.'s MSJ, ECF No. 68-7. At the time of the selection process, Ms. Lamaute was an "older Black woman," Pl.'s Counter-Statement of Material Facts ("Pl.'s CSMF"), ECF No. 70-2, ¶ 62; Def.'s Resp. to Pl.'s CSMF, ECF No. 72, ¶ 62, and Mr. Pickett was over the age of 40, Def.'s SUMF ¶ 33; Pl.'s SDMF ¶ 33; Camilleri Decl., Ex. 5 to Def.'s MSJ, ECF No. 68-5, ¶ 14. Both Ms. Lamaute and Mr. Pickett received rankings of "Outstanding" in their most recent annual performance appraisals. Pl.'s CSMF ¶ 14; Def.'s Resp. to Pl.'s CSMF ¶ 14; Lamaute Appl., Ex. 2 to Def.'s MSJ, ECF No. 68-2, at USAID-113–17; Pickett Appl., Ex. 3 to Def.'s MSJ, ECF No. 68-3, at USAID-136–41.

Ms. Lamaute submitted a resume, cover letter, and performance appraisal in support of her application. Def.'s SUMF ¶ 8; Pl.'s SDMF ¶ 8. In her resume, Ms. Lamaute stated that she was "a highly qualified economic growth, emerging markets and international development professional who would add value when it comes to promoting and advancing private sector and small and medium enterprise (SME) development, job creation, inclusive access to finance (A2F), trade and investment, and entrepreneurship policies and programs" in the E&E/TSO/EG area. Lamaute Appl. at USAID-122. She further noted that she had "significant USAID supervisory economic growth, SME, financial and private sector development experience gained over the last 15 years as a manager and supervisor of large and small USAID international development projects and teams." *Id.*

At the time of her application, Ms. Lamaute held the position of "Senior Economic Officer" in USAID's Middle East Bureau. *Id.* She had held various positions in the Middle East Bureau since 2014. Def.'s SUMF ¶ 10; Pl.'s SDMF ¶ 10; Lamaute Appl. at USAID-122–24. One of those experiences was as an Economic Officer in Sri Lanka in 2015, where she "collaborated with senior-level Sri Lankan government officials" as well as with "U.S. Embassy colleagues, the World Bank, the IMF, the Asian Development Bank, and Sri Lanka's civil society and its private sector." Lamaute Appl. at USAID-123. She continued to support USAID's Sri Lanka team virtually from 2016 to the time of her application "on another longer-term public financial management procurement activity as the [team's] procurement technical team leader." *Id.*

As for her experience overseeing economic development programs, Ms. Lamaute noted that she served as a trustee of a private sector pension fund, performed as the "project manager of a $30 million USAID equity matching activity for small and medium enterprises (SMEs) in Iraq," and briefly managed a portfolio of "$243 million in bilateral agreements." *Id.* at USAID-122–23.

Ms. Lamaute listed the following previous supervisory experiences within USAID: Acting Deputy Office Director, Office of Governance and Economic Opportunity (USAID/Iraq) (approximately one month); Acting Economic Growth Officer, Office of Governance and Economic Opportunity (USAID/Egypt) (approximately two months); Chief of Economic Governance Division, Office of Economic Growth Infrastructure (USAID/Afghanistan) (approximately one year); Acting Office Director of the Office of Democracy, Governance and Social Transition within the Bureau for Europe & Eurasia (approximately two years). Def.'s SUMF ¶¶ 11–12; Pl.'s SDMF ¶¶ 11–12; Lamaute Appl. at USAID-123–25. Prior to that, Ms. Lamaute had other, non-supervisory positions within USAID's economic growth sector since 1998, save for a three-year period (mid-2005 to mid-2008) when she served as the Director of International Program Studies at the Social Security Administration. Pl.'s CSMF ¶ 3; Def.'s Resp. to Pl.'s CSMF ¶ 3; Lamaute Appl. at USAID-125–26.

Mr. Pickett submitted a resume, a performance appraisal, and an academic report in support of his application. Def.'s SUMF ¶ 13; Pl.'s SDMF ¶ 13; Pickett Appl. At the time his application, Mr. Pickett was the Director of the Crisis Surge Support Staff Office, a position that he had held since 2013. Pickett Appl. at USAID-145. In summarizing his experiences, he noted that he "[l]ed design teams developing economic growth, local government, infrastructure and community development projects" and that "[d]uring a 25 year career with USAID programmed over $2.5 billion of bilateral assistance in countries of Southeast Europe and the Middle East." *Id.* at USAID-144. Additionally, he "managed a highly successful $300 billion portfolio of post conflict transition and economic growth projects at USAID/Serbia, a complex and politically sensitive $230 million infrastructure rehabilitation project at USAID/Bosnia & Herzegovina, and various infrastructure, education, and health projects at the Omani American Joint Commission." *Id.*

Mr. Pickett's resume listed a variety of previous supervisory positions that he held within USAID from 1998 through 2017, including the following: Deputy Director, Infrastructure Office (USAID/Bosnia & Herzegovina) (approximately two years); Deputy Director, General Development Office (USAID/Serbia & Montenegro) (approximately five years); Director, Economic Growth Office (USAID/Serbia & Montenegro) (approximately four years); Director, Office of Civilian Response (USAID/Washington, D.C.) (approximately four years); and Director, Crisis Surge Support Staff Office (USAID/Washington, D.C.) (approximately four years). Def.'s SUMF ¶ 15; Pl.'s SDMF ¶ 15; Pickett Appl. at USAID-145–46. Additionally, Mr. Pickett served on the Iraq Task Force (approximately two years), as the Officer in Charge (USAID/Montenegro) (approximately two years), and as the Senior Development Advisor (USAID/Iraq) (approximately two years). Def.'s SUMF ¶ 16; Pl.'s SDMF ¶ 16; Pickett Appl. at USAID-145–46.

*3. Selection Panel*

Ms. Lamaute and Mr. Pickett's applications were submitted to the selecting official, Robert Camilleri, the Deputy Director of USAID's Technical Support Office. Def.'s SUMF ¶ 17; Pl.'s SDMF ¶ 17. USAID uses the terms "selecting official" and "hiring manager" interchangeably. Contreras Dep. Tr., Ex. 16 to Pl.'s Opp'n, ECF No. 70-18, at 35:7–12. As of the time of his deposition, Camilleri had served on approximately 25 selection panels and of those 25 panels, he had served as the selecting official on 10. Def.'s SUMF ¶ 18; Pl.'s SDMF ¶ 18; Camilleri Dep. Tr., Ex. 15 to Pl.'s Opp'n, ECF No. 70-17, at 27:15–20; 28:2–3; Camilleri Decl. ¶ 3. As the selecting official, Camilleri determined the selection panel, facilitated communications with the USAID Human Resources specialists, and was given access to USAID's job application system (Monster.com). Def.'s SUMF ¶ 19; Pl.'s SDMF ¶ 19; Camilleri Decl. ¶ 6.

7

Camilleri selected two additional members of the selection panel: David Reside, Deputy Director of the Eastern European team, and Stephen Little, a member of the Economic Growth team. Def.'s SUMF ¶ 20; Pl.'s SDMF ¶ 20; Camilleri Decl. ¶ 7. Reside was selected as a representative of an office external to the Position and Little was selected as a subject-matter expert on economic growth. Def.'s SUMF ¶ 21; Pl.'s SDMF ¶ 21; Camilleri Decl. ¶ 7.

*4. Selection Criteria*

USAID aimed to fill the vacancy with an individual "serving as a technical expert in the economic growth field, with experience in the Europe and Eurasia region, and with experience related to economic growth programming." Def.'s SUMF ¶ 26; Pl.'s SDMF ¶ 26; Camilleri Dep. Tr. at 107:16–20. USAID requires hiring officials to select the best candidate as measured by the criteria set forth by the position description without regard to race, sex, or age. Pl.'s CSMF ¶ 89; Def.'s Resp. to Pl.'s CSMF ¶ 89; ADS Chapter 418 Merit Staffing Program for Civil Service (CS) Employees ("ADS 418"), Ex. 20 to Pl.'s Opp'n, ECF No. 70-22, at 7–8.

Camilleri testified that he was looking for a candidate who had three qualities: (1) "broad knowledge of economic growth"; (2) "knowledge of the region"; and (3) "the ability to manage people." Camilleri Dep. Tr. at 88:6–12. He testified that he was unable to rank those characteristics in order of importance because, in his opinion, a successful candidate "need[ed] [all] three pieces." *Id.* at 89:17–20. Reside testified that he was looking for a candidate with "technical expertise in the areas . . . and that there were no other criteria . . . in mind when evaluating." Reside Dep. Tr., Ex. 19 to Pl.'s Opp'n, ECF No. 70-21, at 94:12–20. Little testified that a candidate's "management [experience] was more important than liaison and advisory experience" and that he considered a candidate's "management skills and experience" to be "fairly similar" in importance to a

candidate's "economic growth expertise." Little Dep. Tr., Ex. 18 to Pl.'s Opp'n, ECF No. 70-20, at 113:10–18.

As for managerial experience, Camilleri testified that the applicant was expected to interface with USAID management, including the Assistant Administrator, the Deputy Assistant Administrator, and "other parts of [USAID] on broad policy and strategic issues." Def.'s SUMF ¶ 23; Pl.'s SDMF ¶ 23; Camilleri Dep. Tr. at 86:5–12. Additionally, Camilleri testified that the applicant was expected to manage people "who are all technical experts in various different aspects of economic growth." Camilleri Dep. Tr. at 86:13–19; Def.'s SUMF ¶ 24; Pl.'s SDMF ¶ 24. According to Camilleri, the "number of people" the applicant had experience managing was not "as significant as the type of people that they had experience managing," because "the more important thing was managing economic growth people." Camilleri Dep. Tr. at 109:6–14. Reside testified that an individual with previous management experience at USAID in economic growth was not necessarily preferred. Reside Dep. Tr. at 151:17–22, 152:1–3. Little testified that he considered "that management [experience] was more important than liaison and advisory experience." Little Dep. Tr. at 113:10–13.

The panelists considered the candidates' other qualities not otherwise captured in the Position description. Camilleri testified that he was looking for someone who was "easy to work with." Camilleri Dep. Tr. at 94:3–8. When asked to expand on his comment, Camilleri explained that his "primary consideration as far as personality traits go" was that the person selected "could work with the folks there, manage conflict, . . . manage expectations with the front office and, . . . keep things on an easy, collegial, and productive keel." *Id.* at 95:10–16. Reside testified that the selection panel examined "[h]ow comfortable [the candidates] appeared to be, [and] how they conducted themselves in responding," Reside Dep. Tr. at 122:10–15, and that "interpersonal skills"

and what the candidates discussed factored into his decision-making. *Id.* at 144:7–10, 122:10–15, 125:6–10.

*5. Interviews*

The selection panel conducted separate interviews with Ms. Lamaute and Mr. Pickett in mid-September 2017. Compl., ECF No. 1, ¶ 13; Answer, No. 6, ¶ 13. As part of the interview, and consistent with USAID policy, the panel asked each candidate the same questions in the same order. Def.'s SUMF ¶ 22; Pl.'s SDMF ¶ 22; Camilleri Dep. Tr. at 34:21–22; Camilleri Decl. ¶ 9. Each panelist took written notes of each candidate's interview. Ex. 13 & 14 to Def.'s MSJ, ECF Nos. 71-4, 71-5.

Regarding Mr. Pickett's interview, Camilleri testified that his "interview responses demonstrated that he had excellent knowledge of the economic growth concepts in general, the region in particular, and good experience managing people and programs." Camilleri Dep. Tr. at 126:7–10. Reside testified that Mr. Pickett "discussed more how he worked with people to get things done or for them to manage things" in a "descriptive" manner. Reside Dep. Tr. 163:8–10. Little recalled that Mr. Pickett "had experience in the region previously, economic growth experience and . . . extensive management experience within [USAID]." Little Dep. Tr. (Condensed), Ex. 9 to Def.'s MSJ, ECF No. 68-9, at 105:4–7.

According to Ms. Lamaute, she "went into great detail and length about [her] years of experience as a professional and as a government employee managing . . . small and large teams." Lamaute Dep. Tr., Ex. 13 to Pl.'s Opp'n, ECF No. 70-15, at 71:23–25. Ms. Lamaute also discussed her experience with "hir[ing], fir[ing], and provid[ing] performance reviews" and her "20-plus years' experience" as a "mentor and coach" for her team members. *Id.* at 72:1–4. Ms. Lamaute

believes that she provided a specific example of managing individual employees. *Id.* at 72:4–6; Lamaute Decl., Ex. 12 to Pl.'s Opp'n, ECF No. 70-14, ¶ 55.

The panelists have different recollections of Ms. Lamaute's interview. Camilleri testified that Ms. Lamaute "clearly demonstrated her technical expertise" and "her experience in the region," but that her "response didn't speak as much to the . . . programmatic . . . [and] administrative management side" of the position." Camilleri Dep. Tr. at 126:12–127:3. That said, he noted that she "gave great answers about how to work with teams, how to work with technical experts, [and] what the challenges are working with really smart people with really strong personalities." *Id.* at 127:3–127:6. Reside testified that Ms. Lamaute "talk[ed] more about specifically managing a project versus managing the people that manage the projects." Reside Dep. Tr. at 163:11–13. Little testified that parts of her answers to questions made him believe she would have been a strong manager, including "her getting to understand the team, . . . their likes and dislikes, and . . . listening[.]" Little Dep. Tr. at 93:5–12.

Reside testified that he could not recall if the panel considered the candidates' liaison and advisory services skills. Reside Dep. Tr. at 119:17–120:4. Little testified that, based on his notes from the interview, Ms. Lamaute mentioned her liaison experience with the State Department, European Bank for Reconstruction and Development, and International Monetary Fund. Little Dep. Tr. at 95:21–96:12. Camilleri testified to Ms. Lamaute's previous liaison experience and particularly his experience working with her on an interagency project, where he thought that "she was great," "very responsive," "always gave informed comments and suggestions," and that "[s]he was real easy to work with." Camilleri Dep. Tr. at 116:16–18.

*6. Selection*

After the interviews, the panel members checked references and then conversed about the candidates to (1) determine whether either applicant was qualified for the position and (2) rank the candidates. Def.'s SUMF ¶ 29; Pl.'s SDMF ¶ 29; Camilleri Dep. Tr. at 35:5–11, 43:11–14; Camilleri Decl. ¶ 10. The panel determined that both Ms. Lamaute and Mr. Pickett were qualified. Def.'s SUMF ¶ 30; Pl.'s SDMF ¶ 30; Camilleri Dep. Tr. at 124:12–18, 141:20–21; Camilleri Decl. ¶ 11. The panel ranked Mr. Pickett first and Ms. Lamaute second. Def.'s SUMF ¶ 31; Pl.'s SDMF ¶ 31; Camilleri Dep. Tr. at 142:2–9; Reside Dep. Tr. at 120:12–22, 121:1–4, 121:17–19; Little Dep. Tr. (Condensed) at 59:15–20, 105:2–7, 105:13–20, 112:11–22. Camilleri testified that there was no "standardized rubric" to evaluate the candidates "other than the[ ] percentages on the position description." Camilleri Dep. Tr. at 121:12–122:13. Camilleri sent the selection certificate to USAID's Office of Human Capital and Talent Management ("HCTM") reflecting this ranking on September 21, 2017. Compl. ¶ 15; Answer ¶ 15. On November 29, 2017, a representative of HCTM notified Ms. Lamaute that she was not selected. Compl. ¶ 17; Answer ¶ 17.

The panelists had specific reasons for choosing Mr. Pickett over Ms. Lamaute. According to Camilleri, "[t]he main reason for ranking Mr. Pickett first was because of his management experience and responses from references highlighting his skill at managing staff" and that "[s]pecifically, Mr. Pickett's resume, interview, and references[ ] demonstrated and highlighted his skills of managing economic growth technical staff, which was directly applicable to the position." Camilleri Decl. ¶ 12. Camilleri further stated that "[t]hough Ms. Lamaute's references were very positive—her references described her as being very pleasant and a team player—[Mr. Pickett's] references gave glowing reviews of his leadership and management abilities." Camilleri Aff., Ex. 21 to Pl.'s Opp'n, ECF No. 70-23, at ¶ 18. Camilleri added that Ms. Lamaute's references

"verif[ied] that she was a really strong team leader." Camilleri Dep. Tr. at 134:22–135:10. Camilleri also recalled that "Mr. Pickett gave a very moving answer to the question about professional mistakes that he made" which was "possibly the best answer to that question that [he had] ever heard anybody give." *Id.* at 123:20–124:3.

Reside testified that, in his view, Mr. Pickett demonstrated skills that "lent [themselves] a little bit more to what [he] viewed as the needs of the office, the supervisor who had technical awareness, but really was not managing the specific programs, but, rather, managing the people who were managing the programs." Reside Dep. Tr. at 120:21–121:4. According to him "the way [Ms. Lamaute] described her successes were based not on the management of the team, but the management of the project." *Id.* at 164:7–10. Little testified that "what stood out to [him]" about Mr. Pickett was his "significant USAID experience including economic growth experience, and also he had served in managerial positions for a significant amount of time within USAID." Little Dep. Tr. (Condensed) at 59:17–20.

### 7. Relevant USAID Policy

The Court will next address USAID's (1) diversity safeguards in place at the time of the application—(a) the racial composition of the selection panel; (b) the provision of diversity profile information; and (c) facilitation of diversity training—and (2) hiring policies—(a) the preparation of a selection memorandum; (b) participation by the hiring manager; and (c) composition of the selection panel by role.

#### i. Diversity safeguards

##### a. Racial composition of panel

USAID has issued "Standard Operating Procedures (SOP) for Conducting Hiring Interviews and Reference Checks," the stated purpose of which is "to provide consistent guidance

for hiring managers to conduct interviews and reference checks for positions at the GS-15 grade level and below." SOP, Ex. 17 to Pl.'s Opp'n, ECF No. 70-19, at USAID-1234. The SOP recommends that hiring managers put together a "diverse pool of interview panel members." Contreras Dep. Tr. at 62:2–7. All three members of the selection panel were white men. Compl. ¶ 42; Def.'s Answer ¶ 42.

### b. Diversity profile

Under USAID policy, the agency's Office of Civil Rights and Diversity ("OCRD") is responsible for, among other tasks: "[d]evelop[ing] and issu[ing] an annual diversity profile that identifies under-representation of certain groups within the agency"; "[p]roviding the diversity profile data to selecting officials as part of the hiring process via [an] automated referral system"; and "participat[ing] actively with hiring managers" and the agency's HCTM team "during the recruitment process prior to selection." ADS 418 at 9–10.

The OCRD did not provide diversity profile data to Camilleri nor did the OCRD engage with him during the selection process. Pl.'s CSMF ¶¶ 68–69; Def.'s Resp. to Pl.'s CSMF ¶¶ 68–69; Camilleri Dep. Tr. at 70:8–16.

### c. Diversity training

USAID's 2016–2021 Human Resource Transformation Strategy and Action Plan notes that one of the "action steps" to meet the goal of promoting diversity and inclusion was to "[o]ffer training for interview panels to ensure that diversity candidates are treated fairly by training panel members on topics such as identification of inherent bias." Trans. Plan, Ex. 2 to Pl.'s Opp'n, ECF No. 70-4, at 53. According to a previous head of OCRD, "if you're on an interview panel, you have received some training because managers have mandatory training." Detherage Dep. Tr., Ex. 30 to Pl.'s Opp'n, ECF No. 70-32, at 70:18–71:4, 108:18–20.

Camilleri believed that he received diversity training within his first year of becoming a supervisor. Pl.'s CSMF ¶ 73; Def.'s Resp. to Pl.'s CSMF ¶ 73; Camilleri Dep. Tr. at 72:11–73:8, 73:12–15, 73:19–21. Reside and Little either could not recall or stated that they did not receive training on how to address unconscious bias in the interview process. Pl.'s CSMF ¶ 73; Def.'s Resp. to Pl.'s CSMF ¶ 73; Reside Dep. Tr. at 67:7–11; Little Dep. Tr. at 149:12–17.

### ii. Hiring policies

#### a. Selection memorandum

Federal regulations and USAID policy require that USAID "maintain a temporary record of promotion sufficient to allow reconstruction of the promotion action, including how candidates were rated and ranked." 5 C.F.R. § 335.103(b)(5); ADS 418 at 10. Additionally, the SOP lists the preparation of a selection memorandum as one of the responsibilities of hiring mangers to justify a hiring decision. SOP at USAID-1236.

The selection panel did not create a selection memorandum explaining the selection of Mr. Pickett over Ms. Lamaute. Pl.'s CSMF ¶ 79; Def.'s Resp. to Pl.'s CSMF ¶ 79. Reside and Camilleri testified that drafting a selection memorandum is a standard practice at USAID and that they created such a memorandum at least some of the time when involved in previous selections. Pl.'s CSMF ¶ 79; Def.'s Resp. to Pl.'s CSMF ¶ 79; Reside Dep. Tr. at 78:19–79:1; Camilleri Dep. Tr. at 149:1–3.

#### b. Participation by hiring manager

Attachment A to the SOP, "Interview Guidelines," states that the "[h]iring manager can be on the interview panel, but cannot serve as a rating official." SOP at USAID-1237. The SOP explains that the contents of Attachment A "are guidelines only and are intended to assist hiring managers with preparing and conducting interviews." *Id.* at USAID-1235; *see also* Hiring

Manager Guide, Ex. 32 to Pl.'s Opp'n, ECF No. 70-34, at USAID-443 (noting that although the "Hiring Manager can be on the interview panel," "they cannot serve as a rating official"). The guide "provides resources and best practices to assist the Hiring Manager in achieving USAID's strategic hiring goals" but does not purport to promulgate official hiring requirements. *Id.* at USAID-438. Camilleri served as the selecting official and participated in both the interviews and the ranking. Def.'s SUMF ¶¶ 17, 29; Pl.'s SDMF ¶¶ 17, 29.

### c. Composition of selection panel based on position

Attachment A to the SOP and the Hiring Manager Guide both state that "[p]anel members should be at the grade level of the vacancy or higher" and that "[p]anel members cannot report to interviewee." SOP at USAID-1237; Hiring Manager Guide at USAID-443. At the time of the interviews, Little formally held a position at the GS-14 level, Pl.'s CSMF ¶ 86; Def.'s Resp. to Pl.'s CSMF ¶ 86, but was in an acting GS-15 position, Contreras Decl., Ex. 15 to Def.'s MSJ, ECF No. 71-6, at ¶ 8. Little would report directly to the person selected. Pl.'s CSMF ¶ 87; Def.'s Resp. to Pl.'s CSMF ¶ 87.

### B. Procedural History

In January 2018, Ms. Lamaute filed a complaint with USAID's OCRD arguing that her non-selection for the Position constituted discrimination on the basis of race, sex, and age. Compl. ¶ 3; Answer ¶ 3. In November 2019, following an internal investigation, the OCRD informed Ms. Lamaute that it did not find reasonable cause to believe she was discriminated against based on her race, sex, or age. Compl. ¶ 4; Answer ¶ 4.

In December 2019, Ms. Lamaute timely filed her Complaint, alleging that USAID illegally discriminated against her when selecting Mr. Pickett over her. Specifically, she claims: (1) disparate treatment based on sex and race discrimination in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.*; and (2) disparate treatment based on sex, race, and age discrimination in violation of Title VII.[2] Compl., ECF No. 1. She seeks compensatory damages, placement in the Position, backpay, attorneys' fees, and any other relief she is entitled to and the Court deems proper. Compl. at 29–30. USAID answered, primarily arguing that USAID's selection decision was made for "solely nondiscriminatory reasons" and that Ms. Lamaute "cannot show those reasons to be pretextual." *See* Answer at 1.

After engaging in discovery, USAID moved for summary judgment. Def.'s Mot. for S.J. ("Def.'s MSJ"), ECF No. 68. Ms. Lamaute opposed. Pl.'s Mem. in Opp'n to Def.'s MSJ ("Pl.'s Opp'n"), ECF No. 70. USAID replied ("Def.'s Reply"), ECF No. 71. USAID's motion is ripe for review.[3]

## II.    LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A court evaluating a summary judgment motion must "view the evidence in the light most favorable to the nonmoving party and draw all

---

[2] The complaint originally included a separate claim of disparate treatment based on age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. *See* Compl. In her opposition to USAID's summary-judgment motion, Ms. Lamaute clarified that she "is no longer pursuing a stand-alone ADEA claim" and instead "pursu[ing] relief under Title VII alone." Pl.'s Opp'n at 11 n.4.

[3] Prior to USAID's summary-judgment motion, Ms. Lamaute filed a motion in limine to exclude or limit the testimony of USAID's proposed trial expert. ECF No. 65. Because the Court will grant summary judgment in full for USAID, the Court will deny Ms. Lamaute's motion as moot.

reasonable inferences in its favor." *Arthridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 629 (D.C. Cir. 2010).

## B. Title VII of the Civil Rights Act of 1964

Federal employment discrimination is prohibited by Title VII, under which it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

Title VII claims that rely on circumstantial evidence—as opposed to direct evidence of discrimination—are analyzed under the burden-shifting framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The employee "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *Id.* at 802. In cases concerning disparate treatment based on race or sex, a prima facie case consists a showing that "(1) [the plaintiff] is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Chappell–Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) (internal citation omitted).

Despite its ubiquitous presence in Title VII cases, the issue of whether the plaintiff has established a prima facie case of discrimination under *McDonnell Douglas* "is almost always irrelevant." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 492 (D.C. Cir. 2008). "[B]y the time the district court considers an employer's motion for summary judgment[,] . . . the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision . . . . That's important because once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'" *Id.* (internal citations omitted). "Rather, in

considering an employer's motion for summary judgment . . . in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* at 494.

This so-called *Brady* rule only applies, however, if the employer properly meets its burden "to articulate a legitimate, nondiscriminatory reason for its action." *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (quoting *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016)). Consideration of the four following factors are "paramount in the analysis" for the second prong of the *McDonnell Douglas* framework in "most cases": (1) "the employer must produce evidence that a factfinder may consider at trial (or a summary judgment proceeding)"; (2) "the employer must raise a genuine issue of fact as to whether the employer intentionally discriminated against the employee"; (3) "the nondiscriminatory explanation must be legitimate"; and (4) "the evidence must present a clear and reasonably specific explanation." *Id.* at 1087–88 (internal citations and quotations omitted). To satisfy the fourth factor, the employer "may not merely state that the employment decision was based on the hiring of the 'best qualified' applicant." *Id.* at 1088–89 (*quoting Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003)). "Instead, the employer must 'articulate specific reasons for that applicant's qualifications such as 'seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination' of such criteria.'" *Id.* at 1089 (quoting *Steger*, 318 F.3d at 1076) (quoting *Increase Minority Participation by Affirmative Change Today of Nw. Fla., Inc. v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990)). While the employer is required to make this showing, the employer "need not persuade the court

that it was actually motivated by the proffered reasons." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

If the employer succeeds in offering legitimate, nondiscriminatory reasons for the action, the "plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. The plaintiff may demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256. Either way, the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphases in original). Evidence of pretext may include "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

## III.   DISCUSSION

For the reasons that follow, the Court concludes that Ms. Lamaute and USAID have met their respective burdens at the first and second prongs of the *McDonnell Douglas* framework but that Ms. Lamaute has not presented sufficient evidence from which a reasonable jury could draw an inference that USAID's stated reason for selecting Mr. Pickett was merely pretext for unlawful discrimination.

### A. Ms. Lamaute Has Established a Prima Facie Case of Discrimination

As a threshold matter, Ms. Lamaute has satisfied her relatively minimal burden of establishing a prima face case of discrimination. *Burdine*, 450 U.S. at 253. Ms. Lamaute establishes, and USAID does not dispute, Def.'s MSJ at 11, that she is a member of a protected class based on her race and age. Ms. Lamaute suffered an adverse action, namely, that she applied for, was determined to be qualified for, and ultimately not selected for the Position. Ms. Lamaute claims that she was rejected because her competitor possessed different immutable characteristics. Considering the foregoing, Ms. Lamaute has met her burden of proof at the prima facie stage. *Chappell–Johnson*, 440 F.3d at 488.

### B. USAID Has Demonstrated That Mr. Pickett's Selection Was Based on Legitimate, Nondiscriminatory Reasons

Having met her burden to establish a prima facie case of disparate treatment, the burden shifts to USAID to establish a legitimate, nondiscriminatory reason for selecting Mr. Pickett over Ms. Lamaute. *Burdine*, 450 U.S. at 253. USAID has offered the following reason: "Mr. Pickett possessed superior management and technical expertise in the economic growth area." Def.'s MSJ at 9. Ms. Lamaute claims that "this proffered reason (1) lacks the requisite specificity necessary to provide plaintiff notice of what she must challenge[;] (2) is insufficiently supported by evidence[;]" and "(3) additional evidence and [USAID's] own inconsistencies question the purported reason's legitimacy." Pl.'s Opp'n at 13–14. Despite Ms. Lamaute's arguments to the contrary, USAID has met its burden to produce admissible evidence demonstrating a specific, legitimate reason for Ms. Lamaute's non-selection. *Figueroa*, 923 F.3d at 1087–88.

Starting with Ms. Lamaute's first contention, she spills much ink arguing that USAID's stated reason fails to satisfy *Figueroa*'s mandate to provide a "clear and reasonably specific

explanation." Pl.'s Opp'n at 13 (citing 923 F.3d at 1087–88).[4] Specifically, Ms. Lamaute claims that USAID's reason is deficient because it does not explain how it applied those standards to evaluate Ms. Lamaute's and Mr. Pickett's candidacies. *See id.* at 14 (citing *Figueroa*, 923 F.3d at 1092). In Ms. Lamaute's view, USAID was required to specify "which type of management or technical skills, i.e. specific duties or tasks, better qualified Mr. Pickett" for the Position than Ms. Lamaute. *Id.* (emphasis removed). However, Ms. Lamaute both reads *Figueroa* far too broadly and misconstrues the record.

In that case, the defendant agency issued promotions through selection boards, which scored candidates based on their performance in six areas. *Figueroa*, 923 F.3d at 1084. The *Figueroa* court faulted the defendant agency's explanation "that the candidates who were promoted were better qualified than [the plaintiff]" as insufficiently specific. *Id.* at 1087. The *Figueroa* court explained that the defendant agency had not provided enough information to demonstrate why the evaluation process "deemed [the plaintiff] less qualified than the highest-ranked candidates." *Id.* at 1093.

Here, USAID's explanation was significantly more detailed than the deficient explanation at issue in *Figueroa*. As stated in the Position's description, the vast majority (75%) of the role's responsibilities were devoted to overseeing economic development programs (40%) and executing supervisory and managerial duties (35%). Mr. Pickett's resume included more than a decade of experience serving in a supervisory role in the area of economic growth, where he necessarily was required to manage technical experts in that field. Def.'s MSJ at 11–12 (citing Pickett Appl. at USAID-143–44). These core skills precisely matched the overwhelming majority of the Position's

---

[4] Ms. Lamaute relies on out-of-circuit precedent as well in support of this argument. Pl.'s Opp'n at 13–15. The Court will not address these cases because *Figueroa* is the only precedent that she cites that is binding on this Court and the out-of-circuit precedent at times appears to contradict with what *Figueroa* requires.

duties and responsibilities. In contrast, at the time of her application, Ms. Lamaute had served as an economic growth supervisor for less than two years. Def.'s Reply at 10–11 (citing Lamaute Appl. at USAID-123–24). While her resume may have included more individual contributor roles in the economic growth field than Mr. Pickett's, USAID's preference for a candidate with more managerial experience in the field was entirely legitimate and nondiscriminatory.

Ms. Lamaute similarly faults USAID for failing to explain "how the hiring committee evaluated each candidate's work experience, or how they applied the position description's criteria to reach the conclusion that Mr. Pickett's experience was superior," which she claims violates *Figueroa*'s instruction that the agency produce enough information to justify its hiring decision. Pl.'s Opp'n at 15 (citing *Figueroa*, 923 F.3d at 1087). She claims that USAID's failure to create or maintain any records to this effect runs afoul of *Figueroa*. *Id.* (citing *Figueroa*, 923 F.3d at 1090). She is mistaken as a matter of law.

In *Figueroa*, the court determined that production of a list of subjective qualities required for the position, the selection panel's declarations that they followed the list, and the determination that the plaintiff was mid-ranked among applicants was "insufficiently substantiated" and therefore raised a genuine dispute of material fact regarding intentional discrimination. 923 F.3d at 1087–88. In explaining the reason for the conclusion, the *Figueroa* court noted that while "scoresheets and precise breakdown between the two candidates" considered for a position are helpful for a plaintiff in "determin[ing] which factors she should challenge at the third prong of the *McDonnell Douglas* framework," such documentary evidence is by no means a requirement for satisfaction of the employer's burden at the second prong. *Id.* at 1090–91. Instead, *Figueroa* requires only that "[w]hen the [employer's] reason [for the candidate's non-selection] involves subjective criteria, the evidence must provide fair notice as to how the employer applied the standards to the

employee's own circumstances." *Id.* at 1092. The court explained that "fair notice" is satisfied as long as the employer provides more than "a vague reason." *Id.*

Here, USAID primarily used objective criteria to make its hiring decision, provided fair notice to Ms. Lamaute of the reason for her non-selection, and adequately substantiated its reasoning. The selection panel reviewed Mr. Pickett's application materials, his responses to interview questions as recorded by the selection panel in contemporaneous notes, and his references. Def.'s Reply at 4–5. These sources "demonstrated that [Mr. Pickett] had served in multiple managerial capacities, specifically in the area of economic growth, and in these roles, Mr. Pickett exhibited deep knowledge of how to manage technical experts—a primary role required of the Supervisory [General] Business Specialist position—all of which qualified him more than [Ms. Lamaute]." *Id.* at 4. These attributes directly corresponded to the Position's required duties and responsibilities listed in the description. Additionally, though the selection panel considered some subjective criteria, the panel made its hiring decision based on objective criteria. *See* Part III.C.5.

As a last gasp, Ms. Lamaute cites two supposed inconsistencies between USAID's stated reason and the record as evidence "draw[ing] into question the legitimacy of [USAID's] purported reason." Pl.'s Opp'n at 16. Both are inconsistencies created by Ms. Lamaute. First, she claims that the Position was primarily a technical one, but that USAID stated that Mr. Pickett was selected primarily for his managerial skill. *Id.* Ms. Lamaute's subjective characterization of the role as technical does not make it so. The Position's GS-15 ranking, titled "Supervisory [General] Business Specialist," and "mere difference of 5% between the 'technical' and 'managerial' skills outlined in the position description" clearly indicated that the Position was *both* technical and managerial. Def.'s Reply at 5–6. "[C]ourts must defer to the employer's decision as to which qualities required by the job . . . it weighs more heavily." *Barnette v. Chertoff*, 453 F.3d 513, 517

(D.C. Cir. 2006). This Court sees no occasion to question USAID's determination. Accordingly, USAID's stated reason of selecting Mr. Pickett for his superior managerial skills in the technical area was not inconsistent with the record or the requirements of the Position. Second, Ms. Lamaute insists that USAID's claims that Mr. Pickett had superior technical skills to Ms. Lamaute is inconsistent with both USAID's claim that he had more management experience and with Ms. Lamaute's characterization of her own technical and managerial skills. Pl.'s Opp'n at 16. The record demonstrates otherwise. USAID has consistently claimed that Mr. Pickett possessed superior managerial skills in a technical area. And it is undisputed that Mr. Pickett's resume included significantly more management experience than Ms. Lamaute, including in the economic growth area. Even assuming that Ms. Lamaute's self-characterization is accurate, the Position required a candidate adept in both economic growth and management, not just one.

In sum, USAID has met its burden to establish a legitimate, nondiscriminatory reason for Ms. Lamaute's non-selection, and that reason is sufficiently supported by the record.

### C. Ms. Lamaute Has Not Raised a Genuine Issue of Material Fact That USAID's Legitimate, Nondiscriminatory Reason Was Pretextual

In reaching the third step of the *McDonnell Douglas* framework, the burden shifts back to Ms. Lamaute to establish that USAID's stated reason was merely pretextual. *Burdine*, 450 U.S. at 253. She attempts to do so based on five separate grounds: (1) she was more qualified for the Position than Mr. Pickett; (2) USAID has given inaccurate and changing characterizations of the candidates' interviews, Ms. Lamaute's work experience, and the selection process; (3) USAID deviated from its standard hiring policies; (4) statistical evidence supports an inference of discrimination; and (5) the selection panel improperly relied on subjective criteria. Pl.'s Opp'n at 16–17. All of Ms. Lamaute's arguments fail to raise a genuine dispute of material fact and therefore the Court must grant summary judgment in favor of USAID.

*1. Ms. Lamaute's qualifications*

As a threshold matter, Ms. Lamaute insists that "a reasonable jury could infer that Mr. Pickett was *no better qualified* than Ms. Lamaute to execute supervisory and managerial duties in the economic growth sector and that [USAID's] stated reason for Ms. Lamaute's non-selection was a pretext for discrimination." *Id.* at 23 (emphasis added). But that is not a correct statement of law. To succeed in establishing a triable issue of fact regarding the legitimacy of USAID's stated reason and "justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006). In other words, Ms. Lamaute must show that she was "'*substantially more qualified*' to perform the duties listed in the vacancy announcement than the successful candidate." *Porter v. Shah*, 606 F.3d 809, 815–16 (D.C. Cir. 2010) (quoting *Lathram v. Snow*, 336 F.3d 1085, 1092 (D.C. Cir. 2003)) (emphasis added).

Ms. Lamaute advances three reasons why she was more qualified that Mr. Pickett: (1) she possessed more overall experience in the economic growth sector and more experience in that sector at USAID; (2) she possessed superior relevant supervisory and management experience; and (3) she was more qualified to provide liaison and advisory services. *See* Pl.'s Opp'n at 17. However, Ms. Lamaute cannot show that USAID's assessment of the candidates' qualifications was objectively incorrect, let alone that she was substantially more qualified than Mr. Pickett.

Ms. Lamaute spends a significant portion of her opposition brief detailing how she believes that she possessed substantially more technical economic growth experience than Mr. Pickett. *See id.* at 18–21. Drawing all inferences in Ms. Lamaute's favor, even if her resume contained more non-supervisory economic growth experience than Mr. Pickett's, that factor alone did not entitle her to selection for the Position. Instead, as Camilleri testified, it was paramount that the candidate

demonstrate experience *managing* technical experts, not merely performing as one. Def.'s MSJ at 13 (citing Camilleri Dep. Tr. at 86:5–19, 106:9–20). Ms. Lamaute counters that she possessed this experience in a more relevant way than Mr. Pickett because she had worked on economic growth projects in multiple countries more recently than what she claims was Mr. Pickett's sole position in economic growth (Director of the Economic Growth Office (USAID/Serbia & Montenegro)), nearly a decade before he applied to the Position. Pl.'s Opp'n at 20. USAID retorts that Ms. Lamaute's characterization "significantly discounted the breadth of Mr. Pickett's economic development experience," which spanned at least a decade. Def.'s Reply at 8–9. USAID further discredits Ms. Lamaute's subjective characterization of her own economic growth experience. *Id.* Without wading into the parties' arm-wrestling over the correct readings of the candidates' resumes, it is plain that Ms. Lamaute has not met her burden to "demonstrate a 'stark superiority of credentials' over a selectee in order to establish an inference of pretext." *Jimenez v. Wolf*, No. 17-cv-2731 (CRC), 2020 WL 12895803, at \*7 (D.D.C. Sept. 24, 2020) (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003)).

 Similarly, the record does not demonstrate that Ms. Lamaute was substantially more qualified in supervisory or managerial skills than Mr. Pickett. She claims that she held more management positions in the economic growth sector than Mr. Pickett. Pl.'s Opp'n at 22–23. However, the quantity of positions is not the same as their quality. Even assuming that Ms. Lamaute's characterization of Mr. Pickett's experience is true, namely, that he only possessed one managerial experience in economic growth, Mr. Pickett held that position for four years. This was approximately the same amount of time Ms. Lamaute spent in all her management positions combined, the majority of which was outside of USAID and the economic growth sector. Def.'s Reply at 11. In contrast, Mr. Pickett had approximately 19 years of management experience, all

within USAID. *Id.* This is far cry from a substantial disparity in their qualifications. And as Ms. Lamaute well knows, the Court will not revisit the wisdom of USAID's evaluation of this experience when the Circuit has "consistently declined to serve as a super-personnel department that reexamines an entity's business decisions." *Holcomb*, 433 F.3d at 897 (internal citation and quotation marks omitted). Even if the Court were to reexamine the decision, that USAID opted for a candidate with similar economic growth management experience but more general management experience and intra-agency management experience than Ms. Lamaute is a perfectly reasonable explanation that does not smack of pretext.

Finally, Ms. Lamaute's complaint that the selection panel did not properly evaluate her liaison and advisory skills is misplaced. Even if the selection panel had determined that she possessed superior qualifications to Mr. Pickett in providing liaison and advisory services, this duties and responsibilities area only comprised 25% of the Position. It is well-settled that "a plaintiff cannot satisfy her burden of demonstrating pretext simply based on [her] own subjective assessment of [her] own performance. A plaintiff has the duty to put forth evidence of discrimination, not to quibble about the candidate's relative qualifications." *Hammond v. Chao*, 383 F. Supp. 2d 47, 57 (D.D.C. 2005) (internal citations and quotation marks omitted). In light of the criteria listed in the Position's description and Mr. Pickett's superior qualifications in technical economic growth and supervisory and management skills, a jury could not draw a reasonable inference of pretext from Ms. Lamaute's non-selection in light of her comparative qualifications.

*2. USAID's supposed mischaracterizations or inconsistent characterizations of the candidates' interviews, Ms. Lamaute's qualifications, and the selection process*

Next, Ms. Lamaute claims that USAID either mischaracterized or gave inconsistent characterizations of (1) the candidates' interviews, (2) her experience, and (3) the importance of

management experience in the determination. Pl.'s Opp'n at 26–29. The record conclusively refutes these assertions.

Ms. Lamaute selects isolated portions of the selection-panel members' depositions to insist that "the record does not support a conclusion that Mr. Pickett discussed his management of people (rather than projects) any more than Ms. Lamaute did," even though, according to her, USAID stated that Mr. Pickett's answers discussed people over projects in its summary-judgment motion. *Id.* at 26–27 (citing Def.'s MSJ at 7). In making this assertion, she primarily cites passages where the deponents remarked that Ms. Lamaute gave answers related to her management of people during the interview. *See id.* (citing Camilleri Dep. Tr. at 126:22–127:6; Little Dep. Tr. at 88:17–89:9). However, as USAID correctly notes, these citations only refer to the selection-panel members' recollections of *her* interview and do not contradict USAID's statement with respect to Mr. Pickett's interview. Def.'s Reply at 13. Additionally, Ms. Lamaute concedes that other portions of the deposition transcripts are consistent with USAID's characterization of Mr. Pickett's interview. *See, e.g.*, Pl.'s Opp'n at 27 (citing Reside Dep. Tr. at 120:16–121:19). What is more, although the selection-panel members had different recollections of specific answers by Mr. Pickett and Ms. Lamaute during the interviews, their overall observations and conclusions regarding those interviews were not inconsistent. The panel members recognized Ms. Lamaute's technical expertise and managerial experience but concluded that Mr. Pickett's experience in both areas was greater and, in the aggregate, more appropriate for the role. *See, e.g.*, Camilleri Decl. ¶¶ 11–12; Reside Dep. Tr. at 120:21–121:4; Little Dep. Tr. (Condensed) at 59:17–20. This determination is not inconsistent with USAID's statements.

Similarly, Ms. Lamaute points to no evidence that the selection panel minimized her management experience. Pl.'s Opp'n at 27–29. She primarily rehashes arguments about her

29

allegedly superior management qualifications which, as discussed above, are belied by the record. Additionally, she claims that the selection-panel members mischaracterized her references by failing to recount every detail that the references provided about her management skills. *Id.* at 28–29. That the selection-panel members did not memorize and repeat the entire contents of her references hardly rises to the level of inferred discrimination. Not every word in a reference letter is applicable to the position or persuasive for the decisionmaker. *Cf. America v. Mills*, 643 F.3d 330, 333 (D.C. Cir. 2011) (Brown, J., dissenting) ("As anyone with hiring experience can attest, employment references—especially references for the management-level positions . . .—are more art than science.").

Finally, she claims that the selection panel improperly considered "management and supervisory experience [to be] the most important factor in hiring for the E&E Position when the clear text of the job description stated that this was only one factor comprising a minority of the E&E position duties." Pl.'s Opp'n at 29. But the Position description and the selection panel's testimony, not to mention the rest of the record, confirm that skills in the supervisory and management area was the second-most significant consideration of three when making a hiring decision for the Position. *See, e.g.*, Camilleri Dep. Tr. at 121:12–122:13, 146:3–13.

Ms. Lamaute does not offer any evidence that USAID engaged in any inconsistencies or misstatements, thereby precluding a jury finding of pretext on this basis. *Walker*, 798 F.3d at 1092.

*3. Statistical evidence, external report, and internal statements*

Outside of the record of her selection process, Ms. Lamaute offers (1) statistical evidence from her expert, (2) an external report by another government agency, the Government Accountability Office ("GAO"), and (3) statements by OCRD officials for the proposition that

"USAID erected barriers to career development, raising an inference of discriminatory animus." Pl.'s Opp'n at 33; *see also id.* at 29–36. None of these sources raises such an inference.

Regarding statistical evidence, according to the Circuit, "[i]n *individual* disparate treatment cases, . . . statistical evidence is less significant because the ultimate issue is whether the *particular* plaintiff was the victim of an illegitimately motivated employment decision." *Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984) (emphases in original). "[S]tatistical evidence could be relevant to showing discrimination if it demonstrated" sex, race, or age disparities between the "pool of available and qualified applicants and those obtaining promotions to managerial positions within [USAID]." *Horvath v. Thompson*, 329 F. Supp. 2d 1, 11 (D.D.C. 2004) (internal citation omitted). While "statistical evidence is certainly relevant to a showing of pretext in disparate treatment actions," it is "ordinarily not dispositive." *Id.*

Ms. Lamaute presents a statistical analysis prepared by Dr. Joshua C. Teitelbaum, a law professor. *See* Teitelbaum Rep., Ex. 7 to Pl.'s Opp'n, ECF No. 70-9. Dr. Teitelbaum analyzed the estimated odds of promotion from GS-14 to GS-15 positions in the civil service of USAID's Washington, D.C. office for the following candidate groups: Black employees and white employees, Black female employees and white male employees, and older Black female employees and younger white male employees. *Id.* at 3, 13, 20. According to Dr. Teitelbaum, "the estimated odds of promotion from GS-14 to GS-15 were 86 percent greater for white men than for Black women and 101 percent greater for younger white men than for older Black women between 2002 and 2018" and "older Black women were 112 percent less likely to be promoted than white men of similar age." *Id.*

Dr. Teitelbaum's analysis runs afoul of *Horvath*'s requirement that such evidence examine both "available *and* qualified applicants." 329 F. Supp. 2d at 11 (emphasis added). The Position

"was open to anyone with 'one year of specialized experience at a level of difficulty and responsibility equivalent to the GS-14 level in the Federal service,'" and Dr. Teitelbaum used this framework to "consider[ ] GS-14 to GS-15 movement only." Pl.'s Opp'n at 32 (quoting Position Posting at USAID-102). Contrary to Ms. Lamaute's insistence that Dr. Teitelbaum's analysis "was tailored," he only analyzed promotional outcomes for *available* candidates, not *qualified* candidates. The analysis does not consider the potential number of candidates that actually could have applied for and been deemed qualified for the Position, with all of its technical requirements. Without this showing, she is left with "[s]tatistics that indicate nothing more than an under-representation of a protected class," which "cannot by itself create a triable issue of fact." *Whitener v. England*, No. 04-cv-0273 (LFO), 2006 WL 3755220, at *7 (D.D.C. Dec. 19, 2006) (internal quotation marks, alterations, and citation omitted).

Ms. Lamaute's citation of the GAO report suffers from the same shortcomings. She goes into great detail about the statistical and survey results of the report, prepared in June 2020, that she argues establishes USAID's "pattern of poor treatment of other employees in the same protected group as [Ms. Lamaute]" and supports an inference of discrimination in her case. *Walker*, 789 F.3d at 1092; Pl.'s Opp'n at 33–36. Yet, as USAID correctly points out, the report both does not support the propositions Ms. Lamaute advances nor is it probative of the Court's inquiry into the narrow question of whether USAID discriminated against Ms. Lamaute in her 2017 non-selection. Def.'s Reply at 19. The report, entitled "Mixed Progress in Increasing Diversity, and Actions Needed to Consistently Meet EEO Requirements" expressly acknowledged that "[p]romotion rates were generally lower for racial or ethnic minorities than for whites in both the Civil and Foreign Services," and that "the differences shown by our adjusted analyses were generally statistically significant only in the Civil Service." GAO Rep., Ex. 4 to Pl.'s Opp'n, ECF

No. 70-6, at 26. The GAO went on to say: "However, our analyses do not completely explain the reasons for differences in promotion outcomes, which may result from various unobservable factors. Thus, our analyses do not establish a causal relationship between demographic characteristics and promotion outcomes." *Id.* at 26. In other words, the GAO could not determine if racial and ethnic minorities are underrepresented in USAID leadership due to discrimination or any other factor—a classic correlation versus causation conundrum. Ms. Lamaute's burden is to demonstrate at least a triable issue of fact as to causation. She is unable to do so.

Ms. Lamaute additionally claims that the GAO examination of USAID's diversity initiatives in its 2016–2021 Human Resource Transformation Strategy and Action Plan and its 2017 Diversity and Inclusion Strategic Plan, as well as its subsequent "abandon[ment] of these initiatives by 2017," further supports an inference of discrimination. Pl.'s Opp'n at 35. USAID protests Ms. Lamaute's characterization of the plan's termination, citing the GAO's notation that Human Resource Transformation Strategy and Action Plan was merely "narrowed [in] scope" and the "diversity and inclusion elements" "were put on hold." Def.'s Reply at 19 (quoting GAO Rep. at 44 & n.61). Another portion of the report stated that USAID "has implemented some aspects of the Diversity and Inclusion Strategic Plan" despite these strategic shifts. GAO Rep. at 45. Regardless of the precise scope and effect of USAID's decision not to move forward with the strategic plans, it is well-understood that agencies may be required to alter such plans from time to time. "Without more, such routine business planning does not raise an inference of discrimination." *Ranowsky v. Nat'l R.R. Passenger Corp.*, 746 Fed. App'x 23, 31 (D.C. Cir. Aug. 14, 2018). Neither GAO's observations nor USAID's agency-wide diversity initiatives are evidence from which a reasonable jury could draw an inference of discrimination here.

Finally, Ms. Lamaute cites lines from a 2016 exit memorandum from one OCRD official and a 2017 funding request from another OCRD official for the proposition that USAID engages in a pattern of depriving OCRD of the funds it requires and thus, by extension, intentionally creating a discriminatory workplace culture. Pl.'s Opp'n at 29–30; *id.* at 36. As with other aspects of her argument, Ms. Lamaute's selective quotations from her sources undercut the sweeping propositions she makes. Resource constraints are a perennial problem in every government agency. And offices naturally request more funds than an agency is able to give them for legitimate, business reasons unrelated to discriminatory animus. For these reasons, inadequate funding for diversity initiatives, standing alone, falls far short from raising an inference of discrimination. *Cf. Bellinger v. Bowser*, No. 17-cv-2124 (TJK), 2018 WL 4705808, at *8 (D.D.C. Sept. 30, 2018) ("[B]udget numbers themselves" "do not approach anything close to the type of pattern required to infer intentional racial discrimination.").

As with her previous arguments, the statistical evidence, GAO report, and OCRD statements offered by Ms. Lamaute do not raise a genuine issue of material fact that USAID's stated reason for her non-selection was merely pretext.

*4. USAID's diversity safeguards and hiring policies*

Ms. Lamaute next argues that USAID's "fail[ure] to employ its own limited diversity safeguards during Ms. Lamaute's hiring process" and "deviat[ion] from internal hiring procedures without explanation" either support an inference of discrimination or actually demonstrate that the stated reason for its decision was pretextual. Pl.'s Opp'n at 36–41. Either variation of the argument misses the mark.

As a threshold matter, "[a]n employer's failure 'to follow its own regulations and procedures, alone, may not be sufficient to support' the conclusion that its explanation for the

challenged employment action is pretextual." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180,

1183 (D.C. Cir. 1996) (quoting *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982)). "[S]uch

a failure is certainly not irrelevant," *Jeffries v. Barr*, 965 F.3d 843, 858 (D.C. Cir. 2020), but "it is

essential that the claimant establish discriminatory motive." *Johnson*, 679 F.2d at 922 (internal

quotation marks omitted). For this reason, courts in this District regularly find that deviations from

internal policies are not sufficient to raise a triable issue of fact as to pretext without further

evidence that the deviation was motivated by discrimination. *See, e.g.*, *Tabron v. Johnson*, 21 F.

Supp. 3d 84, 88 (D.D.C. 2014); *Lane v. Vasquez*, 961 F. Supp. 2d 55, 72 (D.D.C. 2013); *Oliver-*

*Simon v. Nicholson*, 384 F. Supp. 2d 298, 312–13 (D.D.C. 2005).

### i.  *Diversity safeguards*

Ms. Lamaute argues that USAID impermissibly deviated from internal diversity safeguards

in three main ways during her selection process: (1) composing the selection panel entirely of

white men; (2) not providing diversity profile data to the selection panel or engaging with the

panel; and (3) failing to train members of the selection panel on diversity. Pl.'s Opp'n at 36–37.

As the record and applicable law demonstrates, these actions were either not required, taken, or

insufficient to meet her burden to raise a reasonable inference of discriminatory intent.

As for her first point, USAID merely "recommends" the composition of a diverse selection

committee; there is no express policy requiring it. Def.'s Reply at 20 (citing Contreras Dep. Tr. at

62:2–7). For this reason, Ms. Lamaute cannot claim that the "all-white, all-male hiring panel" was

a "deviation from [USAID's] standard practice." Pl.'s Opp'n at 37. Perhaps Camilleri should have

worked more diligently to select a more diverse selection panel. Even so, the Court disagrees "a

jury could infer something 'fishy'" from composition of the panel alone. *Id.* (quoting *Salazar v.*

*Wash. Metro. Transit Auth.*, 401 F.3d 504, 508–09 (D.C. Cir. 2005)). After all, Ms. Lamaute would

need to convince a jury not only that the panel may have suffered from some implicit bias, but that USAID's proffered nondiscriminatory justification was actually pretextual.

As for her second point, OCRD is only required to provide diversity profile information to selecting officials *on an annual basis*, not for *each* selection panel. Def.'s Reply at 21; ADS 418 at 9–10. Therefore, the non-provision of such data to this selection panel did not violate any agency policy. On the other hand, it is undisputed that OCRD is required to "participate actively" with the selecting official and HCTM prior to selecting a candidate, ADS 418 at 10, and that OCRD did neither. Camilleri Dep. Tr. at 70:8–16; Compl. ¶ 44; Answer ¶ 44. Even so, Ms. Lamaute does not indicate how OCRD's non-involvement in the process "justif[ies] an inference of discriminatory motive." *Lathram*, 336 F.3d at 1093.

And as for her third point, the selection-panel members' failure to recall whether they had received diversity training is similarly not enough to "lead a reasonable jury to conclude bias tainted the hiring panel, and that USAID's reason for selecting Mr. Pickett was pretextual." Pl.'s Opp'n at 38. Taking the facts in the light most favorable to Ms. Lamaute, and assuming none of the selection-panel members received diversity training, she does not explain how this fact, standing alone, supports an inference of discrimination in her non-selection. "In this regard, an error may have occurred in the selection process, but there is nothing to show that it rises to the level of discrimination." *Cuddy v. Carmen*, 580 F. Supp. 788, 792 (D.D.C. 1984); *see also Baskerville v. CBS News Inc.*, No. 18-cv-2522 (FYP), 2022 WL 612608, at *7 n.9 (D.D.C. Mar. 2, 2022) ("The lack of such a training program does not support an inference of specific discriminatory intent.")

Ms. Lamaute's gestures at inconsistencies with respect to USAID's application of its diversity safeguards does not satisfy her burden at the third step of the *McDonnell Douglas* framework.

### ii. *Hiring policies*

Ms. Lamaute next argues that USAID impermissibly deviated from internal hiring procedures in three main ways during her selection process: (1) not producing a scoring sheet or selection memorandum; (2) Camilleri's participation in the candidates' ranking even though he was the selecting official; and (3) Little's participation in the selection panel even though he would be reporting to the candidate. Pl.'s Opp'n at 38–41. As with her complaints about USAID's supposed failure to properly adhere to diversity safeguards, Ms. Lamaute's accusations regarding alleged violations of internal hiring practices either relate to non-binding policies, involve procedures that were actually followed, or otherwise fail to establish discriminatory animus.

USAID was not required to produce a scoring sheet or selection memorandum, and therefore the selection panel did not violate internal hiring procedures when it did not do so. Both parties agree that federal regulations and USAID's internal policy require the agency to "maintain a temporary record of promotion sufficient to allow reconstruction of the promotion action, including documentation on how candidates were rated and ranked." 5 C.F.R. § 335.103(b)(5); ADS 418 at 10. And the SOP lists the preparation of a selection memorandum as one of the responsibilities of hiring managers to justify a hiring decision. SOP at USAID-1236. According to Ms. Lamaute, taken together, those mandates require USAID to prepare a selection memorandum using a "formal rubric or evaluation criteria," and USAID's failure to create one supports an inference of discrimination. Pl.'s Opp'n at 39. The assertion overreads the requirements of the cited policy and SOP. First, the policy does not specify the type and precise contents of the

"temporary record," requiring only that the agency retain enough information "sufficient to allow reconstruction of the promotion action." Here, USAID did just that. The selection panel retained copies of the candidates' applications, took contemporaneous notes of the candidates' performance during their interviews, and produced a selection certificate. Def.'s Reply at 22. The documentation is sufficient to clear the relatively minimal burden laid out by the policy and corresponding regulation. Second, USAID's SOP suggesting the creation of a selection memorandum is merely a best practice, not a requirement. *See* SOP at USAID-1236. And other USAID selection panels sometimes, but not always, prepare a selection memorandum. Camilleri Dep. Tr. at 149:1–3, 151:5–21; Reside Dep. Tr. at 78:19–79:1. Therefore, the selection panel did not violate any policy when declining to create one.

Nevertheless, Ms. Lamaute relies on *Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012), to insist that USAID's documentation is inadequate as a matter of law. Pl.'s Opp'n at 39. This reliance is misplaced. She cites *Hamilton* for the following propositions: because there is "no record of the decisionmaking process beyond notes taken during the interviews," USAID has failed to present adequate "written evidence of their deliberations or their reasons for choosing [Mr. Pickett]," and "this absence of documentation . . . could lead a reasonable jury to doubt [USAID's] explanation." *Id.* at 39–40 (quoting 666 F.3d at 1344, 1355–56) (emphasis removed). The apparent similarities between the present dispute and *Hamilton* evaporate upon closer inspection. In that case, the defendant agency stated that the reason for the plaintiff's non-selection was his interview performance, which the defendant agency was only able to substantiate through half a page of ambiguous notes from one of the three interviewers. *Hamilton*, 666 F.3d at 1349, 1355–56. This case involves a much more robust stated reason for non-selection, and more extensive written record of the decision.

Ms. Lamaute's second argument about USAID's deviation from internal hiring procedures, that Camilleri impermissibly participated in the ranking decision, fares no better. She claims that, as the selecting official, Camilleri was forbidden from providing a ranking of the candidates, but he did so anyway. Pl.'s Opp'n at 40 (citing Contreras Dep. Tr. at 38:4–43:15; Hiring Manager Guide at USAID-443; Camilleri Dep. Tr. at 142:2–6, 145:7–11). However, by its own terms, the Hiring Manager Guide provides mere "best practices," not binding requirements. Hiring Manager Guide at USAID-438. "[P]rocedural irregularities in the selection process also may demonstrate that the employer's justification for a hiring or promotion decision was pretextual," but a plaintiff must also show "how those failures suggest discrimination." *Talley v. Neilsen*, No. 14-cv-1313 (RJL), 2019 WL 635271, at *7 (D.D.C. Feb. 13, 2019) (internal citation and quotation marks omitted). To be sure, USAID's best practice to separate out the selection panel's ranking from the selecting official's ultimate decision strikes the Court as a sensible check on improper influence, and Camilleri's decision to bypass this procedure appears unsavory at the very least. That said, the Court disagrees with Ms. Lamaute that such an inconsistency with internal best practices rises to the level of a discriminatory inference. *See Fischbach*, 86 F.3d at 1183 ("Even if a court suspects that a job applicant 'was victimized by [ ] poor selection procedures' it may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'") (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

Finally, Ms. Lamaute's third argument with respect to USAID's internal hiring procedures, that Little should not have served on the selection panel because he was below the grade level of the vacancy and would report to the person selected, fails for similar reasons. Pl.'s Opp'n at 40 (citing Hiring Manager Guide at USAID-443; SOP at USAID-1237). As a threshold matter, USAID insists that Ms. Lamaute has not met her burden to establish a deviation because Little was

in an acting GS-15 position at the time of the interviews, the same grade level as the Position. Def.'s Reply at 24 (citing Contreras Decl. ¶ 8). Even if this is true, Little's placement on the panel contravened the SOP's guidance in Attachment A that "[p]anel members cannot report to interviewee." SOP at USAID-1237. Regardless, both the SOP and the Hiring Manager Guide, the documents that Ms. Lamaute cites in support of her argument, are just best practices, not formal requirements. Def.'s Reply at 23; *see also* Contreras Decl. ¶ 5. Therefore, Ms. Lamaute has not demonstrated that USAID impermissibly deviated from its policy by allowing Little's participation in the panel. *See Glenn*, 643 F. Supp. 2d at 38.

Ms. Lamaute has not raised a genuine dispute of material fact regarding USAID's diversity safeguards or internal policy from which a reasonable jury could infer pretext for discrimination in her 2017 non-selection.

### 5. Use of subjective criteria

As a final, catch-all category of complaints pertaining to the selection process, Ms. Lamaute argues that USAID policy required the selection panel to "select the best candidate as measured by the criteria set forth by the position description without regard to race, sex, or age," and that the selection panel violated this mandate by: (1) selecting Mr. Pickett even though he was not serving in an economic growth role at the time of the application; (2) placing greater weight on supervisory and management skills than permitted by the Position's description; (3) not considering the criteria in the Position's description; and (4) using subjective criteria like the candidates' interpersonal skills to select a candidate. Pl.'s Opp'n at 41–44. Ms. Lamaute's arguments all are swiftly rebutted by the record.

First, Ms. Lamaute infers from Camilleri's testimony that the selection panel was looking for someone "serving as a technical expert in the field related to economic growth" that the

selection panel was required to choose her for the position because she was the only one of the two qualified candidates serving as an economic growth expert at the time of the application process. *Id.* at 42 (citing Camilleri Dep. Tr. at 107:17–18). Yet, as Ms. Lamaute concedes, USAID policy requires that the selection panel adhere to the qualifications as stated in the Position description, not a member of the selection panel's characterization of the description. *Id.* at 41 (citing ADS 418 at 8–9). The Position's description makes no mention of the applicable time period for a candidate's technical experience, therefore the selection panel was not required to select a candidate serving in the target technical field at the time of the application.

Second, Ms. Lamaute again points to isolated statements in the selection panel-members' deposition transcripts suggesting that the members improperly selected Mr. Pickett based solely on his management experience, which constituted a minority of the required skills for the Position. *Id.* at 42–43; *see also* Little Dep. Tr. at 114:19–20, 141:2–7; Camilleri Dep. Tr. at 106:6–107:9; Reside Dep. Tr. at 153:2–15. As previously stated, the record conclusively demonstrates that the selection panel ranked Mr. Pickett higher than Ms. Lamaute for a combination of factors, including both his managerial skills and his technical expertise. Ms. Lamaute has not raised a genuine dispute that this reason was pretextual.

Third, Ms. Lamaute claims that "there is no evidence that the panelists referred to the position description . . . during the deliberation meeting," a proposition she supports by calling on the "lack of contemporaneous documentation explaining the thought process of the hiring committee." *Id.* at 43. But the absence of documentation detailing the selection-panel members' specific discussion of the Position's description does not support an inference that the panel did not consider it at all. In fact, Ms. Lamaute concedes, and the record confirms, that that the

Position's description "was the only criterion used in the selection process[.]" *Id.* (citing Camilleri Dep. Tr. at 121:12–122:13, 146:3–13).

Fourth and finally, turning again to selections from the deposition transcripts, Ms. Lamaute claims that the selection panel impermissibly considered "suspect interpersonal skills" of the candidates, such as their presentation during the interview and whether they were easy to work with. *Id.* at 43–44 (citing Reside Dep. Tr. at 122:10–15, 125:2–10; Camilleri Dep. Tr. at 94:3–8). USAID responds that Ms. Lamaute misstates the selection panel-members' comments. Def.'s Reply at 25. It is apparent from the record that at least some members of the selection panel considered the candidates' interpersonal skills along with their objective qualifications for the position. However, Ms. Lamaute has not pointed the Court to any evidence "suggesting that [USAID] *relied upon* any highly subjective criterion" in making their hiring decision. *Fischbach*, 86 F.3d at 1184 (emphasis added). "Absent such evidence, [the Court] must reject the claim." *Id.*

Overall, Ms. Lamaute has failed to produce sufficient evidence from which a reasonable jury could conclude that USAID's stated reason for its non-selection of Ms. Lamaute was merely pretext for unlawful discrimination. *See Holcomb*, 433 F.3d at 901.

\*     \*     \*

"The selection of a well-respected employee with significant supervisory experience but [arguably less technical] expertise over one with significant [technical] expertise but far less supervisory experience is precisely the type of business decision that courts are not to second-guess." *Mulrain v. Donovan*, 900 F. Supp. 2d 62, 71 (D.D.C. 2012). Even considering all of Ms. Lamaute's arguments together and taking the facts in the light most favorable to her, she has not raised a genuine dispute of material fact relating to USAID's reason for selecting another candidate for the Position. Therefore, the Court must grant USAID's summary-judgment motion.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** USAID's motion for summary judgment. A separate Order shall issue.

SIGNED this ___ day of August, 2023.

Royce C. Lamberth
United States District Judge